# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

MARK BLANKENBURG,

                     Petitioner,         :        Case No. 1:16-cv-505

      - vs -                               District Judge Michael R. Barrett
                                            Magistrate Judge Michael R. Merz

MICHELE MILLER, Warden,
  Belmont Correctional Institution,

                                        :

                     Respondent.

# REPORT AND RECOMMENDATIONS

This habeas corpus case under 28 U.S.C. § 2254 is before the Court for decision on the merits.

Upon review of the Petition (ECF No. 1), Magistrate Judge Litkovitz, to whom this case was initially referred, ordered the Warden to answer (ECF No. 2). In due course the Warden filed the state court record ("SCR," ECF No. 8) and a Return of Writ (ECF No. 16). Judge Litkovitz thereafter granted motions to expand the record and to file under seal (ECF Nos. 17, 18, 19). The reference was then transferred to the undersigned to help balance the Magistrate Judge workload in the Western Division (ECF No. 20).

Mr. Blankenburg pleads the following grounds for relief:

> The State violated Due Process when it failed to provide sufficient notice of the sex-offenses in the indictment, bill of particulars, and at the trial. Specifically, the State charged multiple, single-act offenses within single counts—indicating that each count contained an undetermined and unspecifiable number of criminal acts and

offenses within each count. Even more specifically, this insufficient-notice claim is directed to Counts 15-18 and Counts 37-41 from the indictment and judgment entry of conviction.

**15:** The State violated Double Jeopardy by convicting Blankenburg of multiple, single-act offenses within single counts. Specifically, the State failed to describe the acts and offenses that formed the basis for Blankenburg's convictions in the indictment, bill of particulars, and at trial regarding Counts 15-18 and 37-41. In this way, Blankenburg remains exposed to future prosecutions for acts and offenses he was already convicted of.

**16:** Blankenburg's trial was unconstitutionally tainted by the three variants of 6th Amendment juror impartiality: i) actual juror bias, ii) implied juror bias, and iii) deliberate juror concealment during voir dire. Specifically, Blankenburg elicited affidavit evidence that a juror in his case was biased against him. The juror was a pharmacist and filled prescriptions for Blankenburg, which the juror failed to disclose, and some offenses involved Blankenburg's abuse of prescription drug laws. The juror had a minor child that treated with Blankenburg, who was a pediatrician, which the juror likewise failed to disclose and where some offenses involved sex abuse of minor patients. Finally, the juror told the affiants she harbored an actual bias against Blankenburg and intended to convict him, which she also failed to disclose.

(Petition, ECF No. 1, PageID 2-3, ¶¶ 14-16.)

**Procedural History**

Petitioner Blankenburg was indicted by the Butler County, Ohio, grand jury on March 6, 2009, on fifty-four counts: four counts of corruption of a minor, eight counts of corruption of another with drugs, nine counts of pandering sexually-oriented matter involving a minor, two counts of aggravated trafficking in drugs, six counts of trafficking in drugs, three counts of bribery, six counts of money laundering, six counts of gross sexual imposition, six counts of illegal use of a minor in a nudity-oriented material or performance, two counts of engaging in a pattern of corrupt

activity, one count of compelling prostitution, one count of complicity to compelling prostitution, and one count of complicity to bribery (Indictment, State Court Record ECF No. 8, PageID 20-36.) Blankenburg waived his right to trial by jury as to some counts, *Id.* at PageID 97, but all counts were tried at the same time. The jury found him guilty of four counts of corruption of a minor, six counts of gross sexual imposition, three counts of compelling or complicity of prostitution, and three counts of pandering sexually oriented matter involving a minor. The trial court found him guilty of four counts of drug trafficking, one count of money laundering and one count of aggravated drug trafficking. He was then sentenced to an aggregated sentence of twenty-one to twenty-seven years. On twelve counts that had been severed, he pleaded guilty to two and the rest were merged. The court sentenced him to twelve months on each count, to be served concurrently with the sentences already imposed.

Blankenburg appealed and his convictions were affirmed. *State v. Blankenburg*, 197 Ohio App. 3d 201 (12th Dist. 2012) ("*Blankenburg I*"), *appellate jurisdiction declined*, 132 Ohio St. 3d 1514 (2012). While the appeal was pending, Blankenburg filed a petition for post-conviction relief under Ohio Revised Code § 2953.21. The trial court denied relief, but the Twelfth District reversed and remanded. *State v. Blankenburg*, 12th Dist. Butler No. CA2012-04-088, 2012-Ohio-6175 (Dec 28, 2012) ("*Blankenburg II*"). On appeal after remand, the Twelfth District affirmed denial of the petition. *State v. Blankenburg*, 12th Dist. Butler No. CA2013-11-197, 2014-Ohio-4621 (Oct 20, 2014) ("*Blankenburg III*"), *appellate jurisdiction declined*, 142 Ohio St. 3d 1465 (2015). Blankenburg, with the assistance of counsel, then filed his Petition in this Court April 29, 2016.

# Analysis

**Ground One: Insufficient Notice and Double Jeopardy[1]**

In his First Ground for Relief, Blankenburg contends that the indictment, the bill of particulars, and the manner of eliciting evidence at trial deprived him of fair notice of the charges against which he was required to defend and violated his right to be free of double jeopardy. In an Interim Report and Recommendations (ECF No. 26), the Magistrate Judge recommended that this Ground for Relief be dismissed with prejudice (ECF No. 26, PageID 3790). Petitioner then notified the Court that he would not be objecting to the dismissal of Ground One (Notice, ECF No. 36). The Court then can proceed to adopt that recommendation without further analysis.

**Ground Two: Juror Bias**

In his Second Ground for Relief, pleaded in paragraph 16 of the Petition, Blankenburg claims his right to a fair and impartial trial by jury was violated in three ways: by actual juror bias, by implied juror bias, and by deliberate juror concealment during voir dire.

In the Interim Report, the Magistrate Judge concluded this second claim was cognizable in habeas corpus and had been fairly presented to the Ohio courts as a federal constitutional claim (ECF No. 26, PageID 3778). Analyzing the state court record, the Magistrate Judge found the decision of the Twelfth District Court of Appeals affirming denial of post-conviction relief "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at PageID 3783, citing 28 U.S.C. § 2254(d)(2). In doing so, the Magistrate Judge agreed with the dissenting judge on the Twelfth

---

[1] Although Blankenburg separates these two claims into Paragraphs 14 and 15 in the Petition, he combines them for argument in his Reply (ECF No. 16).

4

District, Presiding Judge Robert P. Ringland, who wrote:

> Nevertheless, by refusing to hold an evidentiary hearing, the trial court did not have the opportunity to observe T.M.'s co-workers' demeanor and evaluate, firsthand, the sincerity of their testimony regarding what T.M. had told them. Nor did the trial court have the opportunity to observe T.M.'s demeanor or evaluate, firsthand, the sincerity of her response when confronted with her co-workers' testimony that she had told one of them that she was determined to be on appellant's jury and even wanted to be the foreman of that jury so that she could deliver a guilty verdict to appellant. Additionally, there is no evidence in the record that T.M.'s coworkers had any motive to lie about what T.M. told them regarding her desire to be the foreman on appellant's jury so she could deliver a guilty verdict to him. The trial court could not simply accept T.M.'s responses during voir dire as true without considering the validity of her co-workers' affidavit testimony. An evidentiary hearing is needed to determine whether either T.M. or her co-workers were telling the truth or lying about this matter. The statements that T.M. allegedly made to her co-workers, if true, coupled with T.M.'s responses during voir dire, if false, amount to an outright fraud on the court. When a trial court learns of such allegations, it is obligated to investigate them and to act accordingly if it finds them to be true.

*Blankenburg III*, 2014-Ohio-4621, ¶ 40. As Judge Ringland noted, the trial judge had the opportunity to confront Juror 314 (Tara McCarthy) with the accusations of biased statements attributed to her by the post-conviction affiants, but did not do so, and concluded it must conduct an evidentiary hearing to perform that task (Interim Report, ECF No. 26, PageID 3788).

Respondent objected to the Magistrate Judge's conclusions on Ground Two (Objections, ECF No. 27) and District Judge Barrett recommitted the matter for reconsideration in light of the Objections (Recommittal Order, ECF No. 37). The Warden objected to recommittal (ECF No. 43), but Judge Barrett has overruled those Objections (ECF No. 61). The Magistrate Judge then allowed discovery and an evidentiary hearing which was held November 7, 2017 (Hrg. Tr. ECF No. 52). The parties have filed post-hearing briefs (ECF Nos. 56, 57, 60) and the case is ripe for decision.

**Respondent's Objections**

Respondent objected to the Magistrate Judge's interim conclusion that relief was proper under 28 U.S.C. 2254(d)(2) (unreasonable determination based on the evidence presented) because the Interim Report did not consider whether the state court decision was entitled to deference under 28 U.S.C. § 2254(d)(1) (state court decision neither contrary to nor an objectively unreasonable application of clearly established Supreme Court precedent) (Objections, ECF No. 27, PageID 3793-94). The statute reads:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> **(1)**
> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; **OR**
>
> **(2)**
> resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(Emphasis supplied.) As the emphasized disjunctive language makes plain, habeas relief can be granted if the petitioner satisfies either of these two subsections.

Respondent next objects that Blankenburg had to first overcome the presumption of correctness of the state court decision before an evidentiary hearing could be held (Objections, ECF No. 27, PageID 3794-95, relying on 28 U.S.C. § 2254(e)(1). The Magistrate Judge agrees that is a fair reading of the statute. But the Interim Report found, at least implicitly, that Blankenburg had overcome the presumption of correctness by showing that the trial judge relied

on a four-year-old impression of the Juror 314 and did not confront her with the accusations made by her co-workers. That is to say, while the trial judge's finding that she was credible was entitled to a presumption of correctness, that presumption was overcome by the inadequate process that led to the finding.

Respondent's Objections next argue the merits of the trial court's findings on juror bias (ECF No. 27, PageID 3795-3804). These arguments are considered in the analysis of the merits below.

**Evidence Presented in Federal Court**

The Court's finding under 2254(d)(2) overcame the barrier to an evidentiary hearing created by *Cullen v. Pinholster*, 563 U.S. 170 (2011). The Magistrate Judge therefore heard testimony on November 7, 2017 (Hrg. Tr. ECF No. 52[2]).

Petitioner first called Dale Monroe Martin. He worked as a pharmacy technician at Kroger's on Oxford State Road in Middletown in the 2000's. (Hrg. Tr. ECF No. 52, PageID 3908). He was employed there with Tara McCarthy for about a year and a half starting in 2009. *Id.* at PageID 3909. At some point she said she wanted to get on the jury and he "vaguely remember[s] one instance where she said that she wanted to see one of them[3] fry." *Id.* at PageID 3909. The pharmacy where he worked would fill at least one prescription from that practice daily. *Id.* He knew that Ms. McCarthy had a son named Evan. He recalled seeing a prescription for Evan written by one of the Blankenburgs on at least three occasions. *Id.* at PageID 3909-10. He did not recall

---

[2] The transcript was filed in "manuscript" format with four pages of text to one page in the Court's electronic filing system. References herein will be to the PageID number.

[3] Petitioner Mark Blankenburg's brother Scott was also a pediatrician in Butler County, indicted jointly with Petitioner.

7

Ms. McCarthy ever saying she wanted to become foreperson of the jury, but she did want a guilty verdict. *Id.* at PageID 3910. She talked about the upcoming trial fairly often. *Id.* Despite the very large number of prescriptions he processed on a daily basis, Martin believed he remembered Evan McCarthy's prescriptions because "I have a memory with numbers." *Id.* at PageID 3915. When the investigator who obtained his affidavit asked Martin about an Evan McCarthy prescription from one of the Blankenburgs, he declined to answer on the grounds it would violate HIPAA[4]. *Id.* at PageID 3916.

Petitioner next called Robin Abaire Martin, the mother of Dale Martin. *Id.* at PageID 3916. She also worked occasionally with Tara McCarthy at Kroger Store 430 in Butler County in 2009[5]. She claims to have heard McCarthy make statements "a few times" about how she was going to try to be on the jury. *Id.* at PageID 3917. She knows that she at least saw one prescription for Evan McCarthy written by one of the Blankenburg brothers. *Id.* at PageID 3918. When asked why she remembered this particular prescription, she responded: "I've done this for 20 years, there are certain people, certain things you remember. I had a lady that – she was 96 when she died about four years ago. I was the only one she would talk to, and I'm not a pharmacist." *Id*. She's never met Petitioner and had not seen Tara McCarthy since 2009.

On cross, the following colloquy occurred:

> Q. Mrs. Martin, at what point did you decide that it was important that you remembered that in 2009 the Blankenburg – one of the Blankenburg brothers wrote a prescription for, as you say, Tara McCarthy's son?
>
> A. At what point did I think it was important?
>
> Q. Right.

---

[4] The Health Information Patient Privacy Act. Should be abbreviated in the transcript as HIPPA.

[5] This is a different Kroger store from the one where her son worked. *Id.* at PageID 3919.

> A. It's been important because these two people went to jail.
>
> Q. So when did -- my question is, when? Was it at the time you saw the prescription or later?
>
> A. Honey, I see prescriptions every day. I don't know how to answer that.

*Id.* at PageID 3918. She then confirmed that as a pharmacy technician for over twenty years, she sees hundreds of prescriptions a day. *Id.*

Petitioner next called Timothy Blunt who is a pharmacist who worked with Tara McCarthy at the Liberty Fairfield Kroger's. He also had worked with Dale and Robin Martin. *Id.* at PageID 3920. He was asked about an occasion when Robin Martin relayed to him statements about Tara McCarthy

> So she [Martin] approached me one morning when we were by ourselves at the pharmacy and said that Tara had spoken to Dale or said to Dale that she was determined to get on the jury for Mark's trial because her son had been a patient of Mark's and that she was determined to see him fry.

*Id.* at PageID 3921. After he heard this, he related it to Mark Blankenburg's defense team. *Id.* He would fill prescriptions written by one of the Blankenburg brothers daily because they were frequent prescribers. *Id.* Mr. Blunt also vouched for Tara McCarthy's honesty. *Id.* at PageID 3922.

Petitioner rested and Respondent then called Tara McCarthy as a witness. She confirmed that she is a registered pharmacist, that she was a juror for the Mark Blankenburg trial in October 2009, and that she worked at the Kroger store on Oxford State Road. *Id.* at PageID 3924. She confirmed that on any given day hundreds of prescriptions would have been filled at that pharmacy. *Id.* at PageID 3925. It would not have been unusual to fill a prescription written by one of the Blankenburg brothers, but she has never had any personal contact with either one of them. *Id.* Her

9

son Evan never received any medical attention from either of the brothers, but rather at another clinic she named. *Id.* She recalled working with Dale Martin and Timothy Blunt. *Id.*

Ms. McCarthy testified she never told Dale Martin that her son was a patient of Mark Blankenburg or that she ever told him she wanted to be on the jury. *Id.* at PageID 3926. The following colloquy occurred with Respondent's counsel:

> Q. Did you frequently state that -- to Dale Monroe Martin that you were determined to be on that jury?
>
> A. No.
>
> Q. Did you state to Dale Monroe Martin that you wanted to be a foreman on the jury?
>
> A. No.
>
> Q. And that -- did you state to Dale Monroe Martin that you wanted to be a foreman so you could deliver a guilty verdict to Dr. Mark Blankenburg?
>
> A. No.
>
> Q. Did you say that you wanted to see Dr. Mark Blankenburg fry?
>
> A. No.
>
> Q. Did you state that you would not want Dr. Mark Blankenburg or Dr. Scott Blankenburg to have his hands on your son or words to that effect?
>
> A. No.

*Id.* She also confirmed the two times during voir dire when she volunteered information to the trial judge which she thought might disqualify her or at least be relevant: the fact that she was about to become an adoptive parent, which might be distracting, and that she had an aunt who was a long-time recreational drug user, which might be biasing. *Id.* at PageID 3927.

She agreed that she had not told Judge Spaeth during voir dire that she had filled

10

prescriptions written by Mark Blankenburg, but said she had not been asked that question. *Id.* at PageID 3930. She testified she had become frustrated with Dale Martin as his supervisor on occasion because he could not keep up during busy times and she had remonstrated with him about it. *Id.* at PageID 3933.

After the hearing, the parties briefed the case (ECF Nos. 56, 57, 60).

# Analysis

Petitioner originally claimed that his Sixth Amendment right to an impartial jury was violated in three ways: by actual juror bias, by implied juror bias, and by deliberate juror concealment during voir dire (Petition, ECF No. 1, PageID 2-3, ¶ 16). However, after the hearing, he limited his claim to actual juror bias. In his Written Closing Argument, his counsel wrote:

> Blankenburg claims that Juror T.M. was biased against him. This is a different claim than implied bias or a juror's material concealment during voir dire. Implied bias arises when a juror is racist, a misogynist, a religious bigot, has a close relationship with a party or the litigation subject-matter, or in the context of pervasive pretrial publicity. See LaFave, Israel, King, and Kerr, *Criminal Procedure* (3rd Ed.) §22.3(c)(collecting cases). And if a juror conceals material information during voir dire, and inference of bias is recognized. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984); *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995). In contrast with implied bias, Juror T.M. revealed her bias to her coworkers and applied it at trial. Bias was express.

(ECF No. 56, PageID 4072 n.1.) The Court accordingly proceeds to consider only the actual juror bias claim.

Because the Court determined that the state court's decision of this question was an unreasonable determination based on the evidence before it, the federal court is to decide the question of juror bias *de novo*. On that question, the burden of proof is on the Petitioner. *Holder*

11

*v. Palmer*, 588 F.3d 328, 339 (6th Cir. 2009), citing *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001).

Petitioner is correct that if he proves the trial jury included a juror who was actually biased against him, he has shown a structural constitutional error, *i.e.*, one not subject to harmless error analysis. *Hughes, supra*, at 463; *see also Arizona v. Fulminante*, 499 U.S. 279 (1991). Actual bias consists in a predisposition against the defendant which the juror is unable to set aside. *Franklin v. Anderson*, 434 F.3d 412, 422 (6th Cir. 2006). The Supreme Court has held that the question of actual bias is one of historical fact, not mixed fact and law, to wit, "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). *Patton* was a case in which there was substantial adverse pretrial publicity and the question was whether jurors who had been exposed to that publicity were able to put aside their negative reactions. The Supreme Court held that the state court's determination that they had set those reactions aside was a question of historical fact on which the state court decision was entitled to substantial deference, even before enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214) (the "AEDPA").

The question before this Court, then, on *de novo* review is whether Juror McCarthy was actually biased against Petitioner. Petitioner argues this case is far simpler than one in which actual bias must be inferred. Rather, "[t]he question is whether the court believes the coworkers' testimony that the juror revealed her bias to them." (Reply Closing Argument, ECF No. 60, PageID 4114, citing *Patton*, 467 U.S. at 1036.)

As is often the case in this judge's experience, the live testimony is far less persuasive than that presented by paper affidavits.

12

**Testimony of Timothy Blunt**

First of all, the testimony of Timothy Blunt must be disregarded altogether. In his Affidavit in support of Blankenburg's Petition for Post-Conviction Relief, he swore that he was "competent to testify to the following first hand information":

> That Dale Martin told me that Tara McCarthy's child/children were patients at Dr. Mark Blankenburg's pediatric office;
>
> That Tara McCarthy told Dale Martin that she was determined to get on the jury in Mark Blankenburg's criminal case;
>
> That Tara McCarthy also told Dale Martin that she wanted to see Dr. Blankenburg "fry" (her word) for what he had allegedly done to the various victims;

(Affidavit, ECF No. 23-2, PageID 3735, ¶¶ 6-8.)

**Paragraph 6: Even McCarthy as a Blankenburg patient**

The information in ¶ 6 was material to the juror bias question, at least insofar as Blankenburg formerly contended that Tara McCarthy concealed in voir dire that he son Evan was a patient of Blankenburg's. But Blunt is not competent to testify to that ultimate fact. He had first-hand (non-hearsay) knowledge only of Dale Martin's statement that Evan McCarthy was a Blankenburg patient. Dale Martin's statement to that effect would be material only if it were alleged that he later stated Evan was not such a patient and his testimony was offered to prove a prior consistent statement by Dale Martin.

At the hearing, this supposed information turned out to be double hearsay

> So she [Martin] approached me one morning when we were by ourselves at the pharmacy and said that Tara had spoken to Dale or

13

> said to Dale that she was determined to get on the jury for Mark's trial because her son had been a patient of Mark's and that she was determined to see him fry.

(Hrg. Tr., ECF No. 52, PageID 3921.) In other words, what Blunt purportedly knew about Evan being a Blankenburg patien,t he learned from Robin Martin, who had purportedly learned it from her son, who had purportedly learned it from McCarthy.

Blankenburg's counsel argued at the hearing that this testimony by Blunt was not subject to the hearsay rule because he was not trying to prove the truth of the matter asserted (that Evan was a patient) but merely that the statement had been made by McCarthy. But the only witness competent to testify to McCarthy's statement would have been Dale Martin, not his mother and not Timothy Blunt. These deficiencies are not evident, of course, from the fact of the Affidavit in which Blunt purported to have first-hand knowledge.

**Paragraphs 7 and 8: McCarthy's purported intention to get on the Blankenburg jury**

One could reasonably read the Blunt Affidavit as saying he had first-hand knowledge of McCarthy's statements to Dale Martin about getting on the jury: since they were all co-workers, at least at various times, it is plausible that he could have overheard McCarthy say these things to Martin. His live testimony revealed, however, that this was not the case. It was Robin Martin who told Blunt that McCarthy had revealed her intentions about jury service to Dale Martin. (Hrg. Tr., ECF No. 52, PageID 3921.)

While it is certainly the case that if Tara McCarthy made the statements Blunt attributed to her, her impartiality could be questioned, all of his testimony is inadmissible hearsay.

**Testimony of Robin Adaire Martin**

Testimony by Robin Martin about what her son told her McCarthy said is also inadmissible hearsay. What is admissible is her claim to have heard McCarthy make statements "a few times" about how she was going to try to be on the jury. (Hrg. Tr., ECF No. 52, PageID 3917.) She also testified saw one prescription for Evan McCarthy written by one of the Blankenburg brothers. *Id.* at PageID 3918.

Robin Martin's testimony is entitled to little or no weight. She provided no detail at all about the supposed "few times" she heard McCarthy make statements about jury service. Was it twice, three times, or more? What Kroger store did it happen at? Was it early in the day or late in the day? Was anyone else around who might have heard it? Perhaps most tellingly, how did it happen that she came forward with evidence on this point for the first time in 2017, eight years after the relevant events? We know that there was a Blankenburg defense team that obtained the Affidavits from Blunt and Dale Martin. If Robin Martin knew, perhaps from her son, that an investigation of McCarthy's bias was ongoing in 2011, why didn't she come forward then? All of these omissions from her testimony are relevant to her credibility, but none of them was supplied by Petitioner.

Her testimony about the prescription from one of the Blankenburg brothers for Evan McCarhty is even less credible. How does it happen that she should remember one prescription out of hundreds filled each day eight years after she supposedly saw it? When asked why she remembered this particular prescription, she gave no explanation except that she had done this for twenty years and "certain things you remember." (Hrg. Tr. ECF No. 52, PageID 3918.)

15

**Testimony of Dale Monroe Martin**

In his Affidavit in support of the petition for post-conviction relief, Dale Martin averred he worked with Tara McCarthy, "Tara told me that her son, Evan, was a patient of Dr. Blankenburg, and

> Although Tara never said that Evan had been abused by Dr. Blankenburg, she expressed a great interest in being a juror in the case. She was obsessed with it. She talked about it every day, and frequently stated that she was "determined to be on that jury." She also stated that she wanted to be the foreman of the jury so that she could deliver a guilty verdict to Dr. Blankenburg.

(ECF No. 23-2, PageID 3736, ¶ 4.)

What gave weight to this Affidavit in the Court's mind in granting an evidentiary and apparently also in Judge Ringland's mind in dissent in the Twelfth District was that it appeared to be corroborated by Timothy Blunt's Affidavit. After the hearing, we know that it is not thus corroborated by the Blunt Affidavit.

Nor is it corroborated by any other evidence. Dale Martin's testimony at the hearing was far weaker than his Affidavit. As opposed to McCarthy's supposed obsession with the case and talking about it every day, he testified he "vaguely remember[s] one instance where she said that she wanted to see one of them[6] fry." (Hrg. Tr. ECF No. 52, PageID 3908.) As opposed to McCarthy telling him her son treated with Petitioner, at the hearing he relied on a purported memory of seeing Blankenburg prescriptions for Evan. *Id.* at PageID 3914. How did he remember? "I have a memory [for] numbers." *Id.* at PageID 3915.

As a result of the hearing, we also know that Dale Martin had a motive to claim McCarthy

---

[6] Petitioner Mark Blankenburg's brother R. Scott Blankenburg was also a pediatrician in Butler County, and was indicted jointly with Petitioner. (State Court Record, ECF No. 8, PageID 20.)

was biased: she was his supervisor and had "remonstrated" with him on several occasions because he could not keep up with the work. (Hrg. Tr., ECF No. 52, PageID 3933.) McCarthy's testimony in this regard was unrebutted.

**Testimony of Tara McCarthy**

Juror McCarthy's testimony at the hearing was direct and unequivocal. She denied her son Evan had every been a patient of either Blankenburg brother and disclosed where he had received medical treatment at the relevant times.

She admitted she had not revealed in voir dire that she had filled prescriptions written by Petitioner, but she asserted she had never been asked. (Hrg. Tr., ECF No. 52, PageID 3929.) The question which she is alleged to have dodged on this point was about "professional relationships" with the Petitioner and it is a completely reasonable understanding of the question that it would not elicit an answer about filling prescriptions. *Id*. at PageID 3930. While that relationship could properly be characterized as "professional," it is not the sort of relationship which would likely give rise to a bias or any personal connection.

She flat-out denied the statements about wanting to get on the jury which Dale Martin attributed to her. Her testimony is corroborated by the two documented occasions during voir dire when she volunteered information which might have had her removed from the jury, either for cause or peremptorily. (Hrg. Tr., ECF No. 52, PageID 3927.)

**The Evidence that Wasn't Produced**

If Evan McCarthy was a patient of Mark Brandenburg, why didn't the doctor testify to that effect? If he was concerned about possible waiver of his Fifth Amendment privilege by testifying, he never made that point to the Court, which received no explanation of his silence. On the same point, why not produce an unindicted witness from the practice, a nurse or secretary, who could have identified Evan McCarthy as a patient?

Respondent made no best evidence objection to the testimony about the content of prescriptions naming Evan McCarthy has the patient and Mark Brandenburg as the prescriber, so the oral testimony about the document was allowed. But the rationale behind the best evidence rule remains for weighing the testimony: if so much turns on the content of a document, why not produce the document? Is it that the Kroger database does not continue to include this prescription? No explanation was offered.

**Demeanor**

Demeanor of a witness is not evidence, but it is recognized as an acceptable basis for weighing evidence. In *Skilling v. United States*, 561 U.S. 358, 386 (2010), the Supreme Court reminded us that "[r]eviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." Here, the trial judge relied on his estimation of Juror McCarthy's credibility in part based on these factors. Applying those same factors to all the witnesses who testified live, this Court agrees with Judge Spaeth that Tara McCarthy was far more credible than the Martins.

**Conclusion**

The Magistrate Judge incorporates his recommendation as to Ground One from the Interim Report and Recommendations, to wit, that it be dismissed with prejudice. Because Petitioner has acquiesced in that conclusion, the Court can adopt it without further analysis. Based on the analysis in this Report, the Magistrate Judge recommends Ground Two be dismissed with prejudice as well. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

January 9, 2019.

s/ *Michael R. Merz*<br>United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140, 153-55 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).